UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JULIA BOECK,

        Plaintiff,

    v.                                Case No. 16-C-1003

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

        Defendant.

---

## DECISION AND ORDER

---

Plaintiff Julia M. Boeck filed this action challenging the decision of the Commissioner of

Social Security denying her disability insurance benefits and supplemental security income under

Titles II and XVI of the Social Security Act. For the reasons given below, the decision of the

Commissioner will be affirmed. At the same time, the decision is far longer than one would expect

in a case seeking judicial review to determine whether there is substantial evidence in the record to

support the Commissioner's decision. This, I believe, is a function of the expansion of eligibility

under the program to include more difficult-to-measure impairments, the diagnosis and impact of

which is often based on the subjective complaints of the claimant, on the one hand, and the manner

in which judicial review of the Commissioner's decisions in the federal courts is now required to be

conducted, on the other. *See Brandenburg v. Colvin*, No. 14-CV-835, 2015 WL 4755740, at

**8–10 (E.D. Wis. Aug. 11, 2015); *see, generally*, Richard V. Burkhauser & Mary Daly, THE

DECLINING WORK AND WELFARE OF PEOPLE WITH DISABILITIES (AEI Press 2011); Jonah B. Gelbach

& David Marcus, A STUDY OF SOCIAL SECURITY LITIGATION IN THE FEDERAL COURTS (Adm. Conf.

of U.S. 2016); Jennifer L. Erkulwater, *The Judicial Transformation of Social Security Disability: The Case of Mental Disorders and Childhood Disability*, 8 CONN. INS. L.J. 401 (2002). These larger policy issues are beyond the province of a district court, however, and so I turn to the specific facts of the case before me.

## BACKGROUND

This case involves Boeck's fourth application for an award of disability benefits, only two of which proceeded to hearing. R. 322–23. Boeck's hearing on her previous application was held before ALJ William Zellman on July 15, 2011. R. 73–121. On August 26, 2011, ALJ Zellman issued a decision awarding Boeck a closed period of disability from April 3, 2009 through May 20, 2010, but concluding that she was capable of a reduced range of sedentary work following the closed period. R. 7. Boeck did not appeal ALJ Zellman's decision and it became the Commissioner's final decision. She then filed a second application for disability insurance benefits and supplemental security income on March 9, 2012. Boeck, age 42 at the time, alleged an onset date of April 4, 2009. Her claims were denied initially and on reconsideration. She then requested a hearing, and ALJ Robert L. Bartelt, Jr., was assigned.

At the time Boeck filed her second application, she stood 5'5" tall and weighed 212 pounds. She listed arthritis in left knee and pain, right ankle, right wrist, and depression as the conditions that limited her ability to work, the same impairments she listed on the application ALJ Zellman heard. R. 326–27, 83–85. Boeck previously worked as a housekeeper at a nursing home and hotel and as a deli worker. R. 327. She quit her job as a deli worker in June 2009 after surgery on her knee because she was no longer able to do the work. R. 127. Boeck has worked for Consumer Direct as a personal care worker for her mother since that time, although for no more than ten hours per

2

week, and her average monthly earnings have been well below the level required for substantial gainful activity. R. 24, 128.

Boeck was apparently seriously injured in a motor vehicle accident in January 1996, which resulted in multiple fractures, a lacerated liver, abdominal surgery, a collapsed lung, and 7 weeks of hospitalization. R. 540. She recovered from her injuries and eventually returned to work. Concerning her claimed physical impairments, Boeck suffered a fracture of her patella of the left knee, a compound fracture of her right ankle, and a fracture of her right wrist. R. 540, 637. Her left knee was treated with an open reduction internal fixation, which failed and was redone in 2004. R. 637. She continued to have pain and on April 3, 2009, underwent another open reduction internal fixation on her left knee. R. 631. She was discharged the same day with a prescription for Vicodin, but returned to the emergency room the following day requesting Percocet instead. R. 629.

Boeck continued to have pain in her left knee and was referred to Dr. John Horan, an orthopedic surgeon. Dr. Horan examined Boeck on May 27, 2011, and noted her patellar fracture was fully healed and the hardware well in place. R. 518. Based on his examination and review of x-rays, Dr. Horan believed "[Boeck's] problem in her knee is as simple as painful hardware, and we will schedule that to be removed." *Id.* On August 29, 2011, Dr. Horan removed the hardware from her knee during an outpatient procedure at Berlin Memorial Hospital. R. 446, 639. Two weeks later, on September 13, 2011, Boeck reported that "the pain she was experiencing before the surgery appears to be gone." R. 520. Her only frustration at that point was that her quad was weak. *Id.* Six weeks after the surgery, on October 11, 2011, Dr. Horan noted she continued to make good progress with her home exercise program. She was starting to regain her extension power, and she

3

had flexion to 125 degrees. Her knee was stable, she had no effusion and no erythema, and her incision was well healed. R. 521.

On December 7, 2011, Boeck returned to Dr. Horan with "a new problem." R. 522. Her left knee was doing "just fine," but her right ankle was giving her difficulty. The problem was not really new in that Boeck had complained of pain in her right ankle when Dr. Horan first saw her in May. He had injected her peroneal tendon sheath with 1 ml of Kenalog and 1 ml of 0.5% Marcaine with almost 100% initial relief, but it did not last. R. 518, 519. In any event, she reported a significant increase in ankle pain at the December 7 visit to the point she could hardly bear weight on it. R. 522. She reported that it had been coming on for the past two or three weeks, and she felt like the pain was coming from the front of her ankle. Dr. Horan noted the earlier success with the Kenalog/Marcaine injection and tried the same procedure. *Id.* Boeck reported almost 100% relief of her symptoms, and Dr. Horan instructed Boeck to return as-needed. *Id.*

In the meantime, Boeck's family physician, Dr. Michael Staudinger, was also following her post-surgery progress, but appears to have been given significantly different reports by his patient than Dr. Horan was given. In contrast to the report that her knee pain "appears to be gone" and continued progress that Dr. Horan recounted in his post-operative notes, Boeck was complaining of continued pain to Dr. Staudinger. Prior to her surgery, Dr. Staudinger had been prescribing Percocet 5/325 five times a day. On August 31, 2011, only two days after her surgery, Boeck reported to Dr. Staudinger that Dr. Horan had only given her enough pain medication "to make it until today." R. 528. Although Dr. Staudinger noted Boeck was "doing very well" post surgery, he refilled her Percocet prescription because "it is a little painful today." *Id.*

4

On October 17, 2011, only six days after Boeck told Dr. Horan she was making "good progress with her home exercise program" and apparently offered no complaint of significant pain (R. 521), Boeck told Dr. Staudinger that "she is still having severe knee pain." R. 527. Boeck told Dr. Staudinger that she now wanted to have her knee replaced, but that "Dr. Horan doesn't want to replace it because she is only 42." *Id.* Dr. Staudinger commented, "I think it is time that [knee replacement] gets done." *Id.* Boeck said her pain was "sharp the last few days" and asked Dr. Staudinger for something stronger. In response, Dr. Staudinger gave her a prescription for Oxycodone 10 mg tablets to be taken four times a day and told her to follow up in a month. *Id.*

Dr. Staudinger next saw Boeck on November 14, 2011. His office note describes Boeck as "a 42 year old female with chronic pain from a car accident." R. 526. He believed "the pain is in her knees and ankles," but recorded no findings from physical examination as to either. The only finding noted as to her musculoskeletal system is "normal bulk, tone, and strength." *Id.* Dr. Staudinger acknowledged the August 29th surgery performed by Dr. Horan and observed that "we have had her on oxycodone 10 mg 4 a day. I replaced her Percocets and she said this is working out better." *Id.* Dr. Staudinger commented, "Of course it is, we doubled her oxycodone." *Id.* By way of a plan for further treatment, he noted "[w]e are going to keep her on the oxycodone 10 mg q.i.d. for now." He then gave her a prescription to be filled after November 22 and December 22, renewed her Paxil at 40 mg daily, and directed her to follow up with him in two months. *Id.*

Dr. Staudinger's note for Boeck's visit with him two months later on January 25, 2012, is almost identical. Again he describes her as having chronic pain in her knees and ankles, finds she has "normal bulk, tone, and strength," and refills her oxycodone prescription. R. 525. The next two-month follow-up on March 26, 2012, is the same, except that Dr. Staudinger notes that Boeck's

insurance will no longer pay for her oxycodone, so she is going to start buying it from Omro Pharmacy. R. 524. Despite his acknowledgement that Dr. Horan is treating her for her knee and ankle pain, Dr. Staudinger continues to refill her prescription for oxycodone with no other findings on physical examination than noted above.

At her next visit, on June 1, 2012, Boeck again tells Dr. Staudinger that she wants her left knee replaced. Dr. Staudinger notes she is "pretty young," but otherwise, his note is the same as the last three. The only findings noted again are "normal bulk, tone, and strength," and she is given a refill of her prescription for oxycodone and told to follow up in two months. R. 523. Office notes for July (R. 549), September (R. 548), and November (R. 547) of 2012, and January of 2013 (R. 546), are essentially the same as the notes for the previous visits, except that at her visit on September 6, 2012, Boeck asked Dr. Staudinger to fill out a "Musculoskeletal Impairment Residual Functional Capacity Questionnaire." R. 548. Dr. Staudinger commented "[i]t is borderline on a functional capacity exam form and I am going to talk to physical therapy to see if they want to get involved in this or if we should just recommend that she get a functional capacity exam." *Id.* The office note of January 2013 is the last of the office notes from Dr. Staudinger in the record.

Although Boeck was to return to see Dr. Horan on an "as-needed basis, there are no records of further office visits with Dr. Horan after Boeck reported to him in December 2011 that her knee was "just fine" and she received "almost 100% relief of symptoms" in her right ankle from the injection he administered. R. 522. Boeck apparently continued to voice complaints about her right ankle, however, and on July 11, 2013, Dr. Horan performed a revision, right calcaneal osteotomy to address her persistent right Achilles tendonitis. R. 588. She tolerated the procedure well, but later contracted a postoperative infection at the site and was admitted to Berlin Memorial Hospital

on September 7, 2013.  R. 590.  She was diagnosed with a Pseudomonas infection of the right ankle and discharged after six days.  R. 603.  She continued to receive wound care on an outpatient basis but was discharged when she failed to return after her last visit on October 14, 2013.  R. 619–20.

Boeck next presented to the Kennedy Center in Oshkosh in March 2014 with a chief complaint of long-standing ankle pain.  R. 572–73.  She reported that she was alternating NSAIDs and Ibuprofin for relief.  She stated she was taking two Aleve tablets three times a day and two tablets of Tylenol three times a day with occasional ibuprofen.  R. 572.  Upon clinical examination, Dr. Robert Hausserman noted that "[t]here is some mild to moderate tenderness of the plantar fascial origin in the plantar aspect.   No particular localizing tenderness over the Achilles or insertional area.  The primary pain was produced with attempts to passively move the subtalar joint." R. 572.  X-rays of the right ankle demonstrated calcification about the medial and lateral malleoli adjacent to the medial talus on the joint as well as degenerative changes of the subtalar joint.  *Id.*  The diagnostic impression was mild plantar fasciitis and subtalar arthritis with restricted motion.  R. 573.  A podiatry consultation with Dr. Todd Derksen was recommended for further discussion of management options.  *Id.*

Boeck presented to Dr. Derksen on May 21, 2014.  Dr. Derksen noted that Boeck has underwent several surgeries on her right ankle and that she "continues to have sharp burning pain on the lateral aspect of the ankle on the posterior tuber.  It is present all day long, worse with activity or weightbearing."  R. 567.  He observed that Boeck has not done stretching or physical therapy either before or after her surgeries.  *Id.*  Dr. Derksen's impressions were  that Boeck suffered from Aquinas with insertional Achilles tendinitis and subtalar degenerative joint disease right foot.  *Id.*

He did not observe any fractures, dislocations, or pathologic lesions on x-rays of Boeck's ankle. R. 568. Dr. Derksen recommended physical therapy as the next treatment step. *Id.*

On July 16, 2014, Dr. Derksen completed a "Musculoskeletal Impairment Residual Functional Capacity Questionnaire." R. 624–27. Although there is no record of his having seen Boeck since January 2013, Dr. Staudinger also completed the "Musculoskeletal Impairment Residual Functional Capacity Questionnaire" on August 6, 2014, about two weeks after her hearing. R. 646–49. Both will be discussed below.

The record also includes the treatment history for Boeck's alleged mental impairments. Most of Boeck's mental health treatment occurred prior to ALJ Zellman's August 2011 decision. R. 406–43, 448–516. Boeck reported chronic depression dating back to when she was 19 years old. R. 482. Psychologist Dr. Kathleen Roblee diagnosed Boeck in April 2011 with recurrent depressive disorder, moderate; dysthymia; and adjustment reaction with mixed emotion. R. 419. Boeck was prescribed Trazodone in May 2011 to help her sleep, which was soon replaced when she was given samples of Zyprexa. R. 490, 495. She also took Paxil 40mg per day. R. 483. Dr. Roblee discharged Boeck from treatment on September 29, 2011 after seven sessions, noting that she had successfully completed her program. R. 452.

The record also contains a number of reports by medical consultants. On July 17, 2012, Dr. Richard Sturm conducted a consultative physical examination of Boeck for a disability evaluation. R. 539–44. In addition, Scott Trippe, Psy.D., conducted a psychological consultative examination on June 24, 2012, R. 534–38, and several State agency consultants provided opinions regarding her physical and mental impairments based on their review of the record at the time of their reports. R. 165, 166–67, 196, 198–200. These reports also will be further discussed as relevant below.

At the July 22, 2014 hearing before ALJ Bartelt, Boeck testified that she suffers from pain in her right ankle, left leg, and right wrist every day. R. 132. She takes oxycodone daily which provides some relief, but it results in constipation and nausea. *Id.* She also testified that she both ices the affected areas and uses a heating pad periodically throughout the day. *Id.* Boeck described the symptoms she experiences while sitting down as "it's like a throbbing, and sometimes it's real sharp pains . . . ache . . . terrible aches." R. 133. She testified that her pain in her ankle, leg, and wrist has gotten a lot worse within the last year. *Id.* Boeck explained that her right wrist injury makes it more difficult to lift things like a gallon of milk or a coffee pot with her right hand. R. 134. Writing with a pen or using a keyboard makes her right wrist sore. *Id.* She can wash dishes for about 15 to 20 minutes before she needs to sit down. R. 135. Regarding her mental impairments, Boeck testified that she has been treated for depression for over 20 years but that it has gotten worse within the last five to six years. R. 137. She takes 25mg of Paxil to treat her depression. She testified that she has lost interest in doing things and has difficulty sleeping, and that it causes her to eat. R. 138. She naps approximately 30–45 minutes per a day if she feels like she can get some sleep. *Id.* Boeck said she received counseling for her depression problems in the past, but stopped because of insurance reasons. R. 139.

Medical expert Dr. Allen Hauer also testified regarding Boeck's alleged mental impairments. R. 148–51. He categorized Boeck's mental impairment as dysthymic disorder, which is a persistent but low-grade depressive disorder characterized by generalized unhappiness, discouragement and pessimism, easy irritability, and reduced energy and ambition. R. 149. Dr. Hauer opined that Boeck had no limitations in activities of daily living; a mild limitation in social functioning based on her moods, ambition, and willingness to see people outside her normal circuit; and a mild limitation in

concentration, persistence, and pace based on low energy and fluctuating motivation that goes with the depressed mood. R. 149–50. He observed no episodes of decompensation of an extended duration. R. 151. Dr. Hauer factored out any impact or restrictions that Boeck's physical impairments may have on her mental functional limitations. R. 149.

Finally, a vocational expert (VE) testified at the hearing. R. 151–56. After having the VE summarize Boeck's work history, the ALJ asked the VE whether there would be jobs available for an individual of Boeck's age, education, and work experience with the limitations expressed during the hearing. R. 154. The VE stated that he understood the testimony to describe an individual who could stand/walk for up to 15 to 20 minutes at a time and lifting limited to approximately 8 pounds. *Id.* The VE testified that an individual with those limitations could perform sedentary, unskilled positions such as benchwork assembly, production inspectors, machine feeders, surveillance-systems monitors, and cashiers. *Id.*

In a 15-page decision dated November 28, 2014, the ALJ determined Boeck was not disabled. R. 21–35. The ALJ's decision followed the SSA's five-step sequential process for determining disability. At the first step, the ALJ concluded Boeck met the insured status requirements through June 30, 2014 and had not engaged in substantial gainful activity since April 4, 2009, the alleged onset date. R. 23. At step two of the disability analysis, the ALJ found Boeck had the following severe impairments: a left knee impairment; a right ankle impairment; and a right foot impairment. R. 24. The ALJ used more general terms to describe Boeck's severe impairments because different examiners offered various diagnoses to describe her impairments. *Id.* The ALJ considered Boeck's impairments in combination with her obesity and concluded that, based on the objective medical findings and Boeck's significant activities of daily living, obesity was not a severe

impairment because it did not have at least more than a minimal effect on her ability to perform work-related activities. *Id.* The ALJ also considered evidence that Boeck experienced right wrist symptoms including a slightly reduced grip strength on the right side, but observed that she has not required any significant treatment for her alleged wrist symptoms during the relevant period and she retains her ability to manipulate objects. R. 24–25. He concluded that Boeck's alleged wrist impairment also does not constitute a severe impairment. R. 25. Finally, the ALJ considered Boeck's alleged mental impairments and, finding no more than minimal limitations to her ability to perform basic mental work activities and no periods of decompensation, concluded that her mental impairments were nonsevere. R. 25–28. At step three, the ALJ determined that Boeck's impairments did not meet or medically equal any listed impairments under 20 C.F.R. § 404, Subpart P, Appendix 1. R. 28.

The ALJ determined that Boeck had the residual functional capacity (RFC) to perform the full range of sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a). He concluded that the record did not support Boeck's allegations of disabling symptoms during the period relevant to the decision, but also noted that the record contained "considerable evidence from prior to August 27, 2011, the first date relevant for purposes of this decision." R. 30 (citations omitted). At step four, the ALJ found that Boeck was unable to perform any past relevant work. R. 33–34. Nevertheless, he determined that based on her age, education, work experience, and the RFC that there were a significant number of jobs existing in the national economy that Boeck could perform. R. 34–35.

11

## LEGAL STANDARD

The statute authorizing judicial review of decisions of the Commissioner of Social Security states that the findings of the Commissioner as to any fact, "if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is "such relevant evidence as a reasonable mind could accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and his conclusion. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Asrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

Boeck asserts that the ALJ committed at least four errors requiring reversal: (1) ALJ Bartelt and the Appeals Council arbitrarily applied *res judicata*; (2) the ALJ failed to properly evaluate and weigh Boeck's statements about the limiting effects of her symptoms; (3) the ALJ failed to properly

evaluate and weigh the opinions of the various medical sources; (4) the ALJ failed to meet the Commissioner's burden of proof at step-five that other jobs exist for Boeck in significant numbers. I will address each in turn.

## A. Res Judicata

As an initial matter, Boeck contends that the ALJ (and by extension the Appeals Council) erred in arbitrarily applying the doctrine of *res judicata* to procedurally bar her claim for benefits from her alleged onset date of April 4, 2009. As noted above, in a partially favorable decision by ALJ Zellman issued on August 26, 2011, Boeck was granted a closed period of disability insurance benefits from April 3, 2009, to May 20, 2010, but not thereafter. R. 322. Boeck did not appeal the previous decision, thus making it final. Based upon ALJ Zellman's previous decision which, though not a part of the record, is not disputed, ALJ Bartelt concluded Boeck was barred from receiving benefits prior to August 27, 2011. R. 21. Nevertheless, ALJ Bartelt concluded from his review of the evidence that Boeck was not under a disability from April 4, 2009, through November 28, 2014, the date of his decision. R. 35. The Appeals Council granted review and concurred with ALJ Bartelt's determination that *res judicata* applies to the period ending on August 16, 2011, given the previous final decision. R. 7. The Council concluded, however, that ALJ Bartelt had erred in finding that Boeck was not under a disability beginning April 4, 2009, through the date of his decision, since the finding of a closed period of disability from April 3, 2009, through May 20, 2010, was also final and entitled to preclusive effect. R. 7. It therefore modified the decision to state that Boeck was not disabled "at any time beginning August 27, 2011, through the date of the Administrative Law Judge's decision, November 28, 2014. *Id.* In all other respects, the Council adopted ALJ Bartelt's decision. R. 6–7.

Boeck argues that if *res judicata* applies and she is barred from relitigating her claim for disability benefits because of ALJ Zellman's August 26, 2011 decision, then all of ALJ Zellman's findings in that decision are final and the Commissioner is barred from relitigating any of the factual or legal issues that were litigated and decided in the earlier case. Pl.'s Br., ECF No. 11, at 8. Relying on the Appeals Council's statement that the ALJ in the previous case found that "[b]eginning May 21, 2010 there was medical improvement and she was capable of performing *a reduced range of sedentary work*," R. 7 (italics added), Boeck contends that ALJ Bartelt erred in finding that she was capable of the full range of sedentary work and had no nonexertional limitations. Pl.'s Br. at 9. Boeck also claims that ALJ Bartelt acted "contrary to the standards of res judicata and issue preclusion" in evaluating evidence from prior to August 27, 2011. *Id.* Finally, Boeck argues that she had no prior notice that ALJ Bartelt intended to apply *res judicata* to her case, thus depriving her of her constitutional right to due process of law. *Id.* at 10.

I note at the outset that there was no need for either the ALJ or the Appeals Council to address whether the doctrine of *res judicata* applied to the portion of Boeck's claim for the period prior to August 27, 2011. This is because at the close of the hearing before ALJ Bartelt, Boeck's then attorney noted that he had amended his client's alleged onset date to August 27, 2011, in his pre-hearing statement, presumably because he himself recognized that Boeck was precluded by ALJ Zellman's decision from receiving disability benefits for the period before that time. R. 157, 388. Since Boeck was not claiming disability prior to August 27, 2011, there was no need to apply *res judicata* to limit her claim to the period of time that followed, and there was certainly no error in the Appeals Council's decision to amend the ALJ's decision to reflect this limitation. This fact alone renders Boeck's lead-off argument an exercise in futility.

14

Even if Boeck's hearing counsel had not amended her alleged onset date, the ALJ's application of *res judicata*, while unnecessary, could not be considered either arbitrary or improper. Boeck's previous claim for disability benefits, to the extent she sought benefits beyond the closed period of disability she was awarded, was rejected in ALJ Zellman's decision of August 26, 2011. In other words, Boeck's claim for disability benefits for the period from May 20, 2010, through the date of ALJ Zellman's decision was denied. If Boeck thought the denial was in error, she should have appealed. By failing to do so, she allowed the ALJ's decision, which became that of the Commissioner, to become final. *Res judicata* bars attempts to relitigate the same claim. *Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998); *see also* 20 C.F.R. § 404.957(c)(1). Boeck's application of March 9, 2012, presented a new claim, but only to the extent it sought benefits after the effective date of the previous denial, i.e., August 26, 2011. *Groves*, 148 F.3d at 810 (noting that "a claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994"). Thus, the ALJ properly applied *res judicata* to Boeck's pre-August 27, 2011 claim. Even if the court disagreed with the application of *res judicata* to that portion of Boeck's claim encompassed by the earlier denial, however, it seems doubtful it could grant relief. *See Johnson v. Sullivan*, 936 F.2d 974, 976 (7th Cir. 1991) ("A refusal to reopen or a decision to apply administrative res judicata is a discretionary one not subject to judicial review.").

Boeck is also mistaken concerning the application of collateral estoppel or issue preclusion. She contends that because ALJ Zellman apparently found that she was capable of performing only a limited range of sedentary work in his decision of August 26, 2011, ALJ Bartelt was bound by this finding in the subsequent case before him. Instead, he found that she could perform the full range of sedentary work. For this reason alone, Boeck contends, the case must be remanded. But

collateral estoppel only precludes relitigation of the same issue that was necessary to the prior judgment. *Groves*, 148 F.3d at 810. The question of what, if any, work Boeck was capable of performing prior to August 26, 2011, as already noted, is not the same as the question what she was capable of performing thereafter.

The Seventh Circuit addressed this issue in *Rucker v. Chater*, 92 F.3d 492 (7th Cir. 1996). There, the plaintiff filed an application for disability benefits in 1988 which was denied after a hearing. The ALJ concluded that while the plaintiff could not return to her past work as a licensed practical nurse, she retained the RFC to perform sedentary work and thus was not disabled. The plaintiff sought judicial review, and the district court affirmed the denial of benefits. *Id.* at 493–94. Pending the outcome of *Rucker I* in the district court, the plaintiff filed a second application for disability benefits on April 10, 1992. The Social Security Administration denied her claim and the plaintiff again requested a hearing. This time the ALJ found that she was capable of medium work and thus able to perform her past work as a licensed practical nurse. *Id.* at 494. She again sought judicial review, and the district court affirmed. The plaintiff then appealed arguing, *inter alia*, that collateral estoppel precluded the ALJ's finding in *Rucker II* that she was capable of medium work. The court rejected the claimant's argument in language that is equally applicable here:

> Rucker contends that the first ALJ's findings established her "maximum residual functional capacity,"—at that time and forever more. It is the "forever more" with which we disagree. The first ALJ's finding was a binding determination with respect to Rucker's eligibility for disability benefits for that time period. It has no effect, however, on an application for disability benefits for a subsequent time period.

*Id.* at 495. Given the successful surgery performed by Dr. Horan on her knee and additional medical evidence regarding her ankle, it is not surprising that ALJ Bartelt arrived at a different conclusion as to Boeck's RFC.

Boeck's argument that the ALJ acted "contrary to the standards of res judicata and issue preclusion" in evaluating evidence from prior to August 27, 2011, is likewise mistaken. Even though *res judicata* barred the ALJ from finding her disabled during the period of time prior to ALJ Zellman's decision, it did not render the evidence submitted in support of the earlier application irrelevant or inadmissible. The evidence from the earlier period, to the extent that it bears on Boeck's current condition, was still relevant and was properly considered by the ALJ. *Groves*, 148 F.3d at 810 (holding that district judge erred in refusing to look at medical evidence submitted in connection with earlier application and noting that "although the final judgment denying that application was res judicata, this did not render evidence submitted in support of the application inadmissible to establish, though only in combination with later evidence, that she had become disabled after the period covered by the first proceeding").

Boeck's due process argument similarly fails. The Commissioner concedes that the ALJ committed procedural errors in applying *res judicata* to her case. The Commissioner notes that the agency's Hearing, Appeals, and Litigation Manual (HALLEX) requires that in cases where *res judicata* may apply, the notice of hearing should "include a statement to explain that in the absence of new and material evidence relating to the previously adjudicated period, administrative res judicata applies and the determination of decision on the prior application is final and binding on the issue of disability during the previously adjudicated period." HALLEX I-2-4-40(J)(2)(a) (May 1, 2017), https://www.ssa.gov/OP_Home/hallex/I-02/I-2-4-40.html. No such notice was provided here. But that does not amount to a denial of due process. Boeck clearly knew of the previous decision rejecting her claim prior to the hearing, and through counsel could have challenged the ALJ's application of *res judicata* before the Appeals Council if she thought it was improper. The fact that

17

Boeck's hearing counsel did not object to the application of *res judicata* in his request for review by the Council, but only to the misapplication of it by the ALJ to the period prior to August 31, 2011, was no doubt due to the fact that he knew *res judicata* properly applied to the case as he implicitly acknowledged by amending Boeck's alleged onset date to August 27, 2011. Under these circumstances, there was no denial of due process.

In sum, the ALJ's application of the doctrine of *res judicata* to give preclusive effect to ALJ Zellman's previous decision for the period prior to August 27, 2011, as modified by the Appeals Council, while unnecessary given the amended onset date, was neither arbitrary nor improper.

## B. Evaluation of Alleged Symtoms

Boeck next argues that the ALJ and the Appeals Council failed to properly evaluate her statements as to her symptoms and the limiting effects of her symptoms. Pl.'s Br. at 11–21. Boeck's argument that the Appeals Council erred in evaluating Boeck's statements need not be addressed separately since the Appeals Council, but for the amendment noted above, adopted the ALJ's decision. The issue is whether the ALJ's ultimate decision, as modified by the Appeals Council, which became the final decision of the Commissioner, should stand, and it is to the ALJ's assessment of Boeck's credibility that I now turn.

To be sure, if Boeck's statements and testimony were fully credited, a finding of disabled would likely be compelled. In a Function Report she completed on May 14, 2012, Boeck stated she had constant aching and pain in her left knee and right ankle making it difficult for her even to stand. She reported she also had constant aching and pain in her right wrist, limiting her use of her hand as well. She claimed she had depression all her life but it had gotten worse with all the pain she was having, making it hard for her to concentrate. R. 344. She reported she could lift only 5 pounds,

stand 15 minutes, walk 15 minutes before she would need a 20 minute break, sit 45 minutes, and pay attention only 45 minutes before the pain sets in. R. 349. She said she needed to ice her injuries daily and also use a heating pad on them. Because her pain and depression were so severe, she claimed she became so irritable she had a hard time getting along with people and finishing tasks. R. 351. Her testimony at the hearing two years later was similar, except that she said over the past year her pain had gotten worse. R. 133. The question is whether the ALJ was required to accept her statements and testimony about the severity of her symptoms as true.

The Social Security regulations distinguish between symptoms, signs and laboratory findings. 20 C.F.R. § 404.1529. Symptoms, such as pain, fatigue, shortness of breath, weakness or nervousness, are the claimant's own description of her impairments. *Id.* §§ 404.1529(a)–(b). "Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms)." *Id.* § 404.1529(b). Signs are shown by medically acceptable clinical diagnostic techniques. *Id.* Laboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques such as chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (x-rays), and psychological tests. *Id.* § 404.1528(c).

The regulations set forth a two-step procedure for evaluating a claimant's statements about the symptoms, i.e., her subjective complaints. *See* 20 C.F.R. § 416.1529. The ALJ first determines whether a medically determinable impairment "could reasonably be expected to produce the pain or other symptoms alleged." *Id.* § 404.1529(a). If so, the ALJ then "evaluate[s] the intensity and persistence" of the claimant's symptoms and determines how they limit the claimant's "capacity of work." *Id.* § 404.1529(c)(1). In evaluating the intensity and persistence of a claimant's symptoms,

19

the ALJ looks to "all of the available evidence, including your history, the signs and laboratory findings, and statements from you, your treating and nontreating source, or other persons about how your symptoms affect you." *Id.* The ALJ also considers medical opinions. *Id.*

Under Social Security Ruling (SSR) 16-3p, which became effective March 16, 2016, after the decision was issued in this case, the ALJ then determines whether the claimant's statements about the intensity, persistence, and limiting effects of her symptoms are consistent with the objective medical evidence and the other evidence of record. The new ruling is intended to clarify the ruling it superseded, SSR 96-7p, by eliminating the term "credibility" from the Administration's "sub-regulatory policy" so as to make clear that "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2016 WL 1119029, at *2. The application of a new social security regulation to matters on appeal is appropriate where the new regulation is a clarification of, rather than a change to, existing law. *Pope v. Shalala*, 998 F.2d 473, 482–83 (7th Cir. 1993), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999). A comparison of the old ruling to the new ruling reveals substantial consistency, both in the two-step process to be followed and in the factors to be considered in evaluating the statements concerning the intensity and persistence of a party's symptoms. *Compare* SSR 16-3p, *with* SSR 96-7p. It is therefore appropriate to consider the ALJ's evaluation of Boeck's statements concerning her symptoms in light of the new guidance the Administration has provided.

On judicial review of the ALJ's decision, it is important to note that the reviewing court is not to reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the Commissioner. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). Because the ALJ is in the best position to determine the credibility of witnesses, the court reviews

that determination deferentially, although its review is less deferential when the credibility determination is based upon objective factors, as opposed to subjective considerations. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). Still, the question is not whether the court agrees with the ALJ, or whether the ALJ's analysis eliminates all possibility of error. Given the non-adversary nature of the disability adjudication process, the latter standard could seldom be met. In many cases, especially the relatively small percentage of the total claims that go to hearing, the determination of the claimant's true functional capacity rests primarily on the claimant's description of her symptoms offered either directly through the claimant, or indirectly through the claimant's friends and/or family, or through the health care professionals whose training and professional interest strongly encourage acceptance of their patient's description of her symptoms. Medical evidence, in many cases, reveals only the existence of an impairment; not its limiting effects, and only rarely is evidence from a disinterested third party available. *See, e.g.*, *Krause v. Berryhill*, No. 16-C-226, 2017 WL 3189450 (E.D. Wis. July 27, 2017) (affirming termination of DIB based on OIG investigation for VA showing claimant engaged in activities inconsistent with claimed incapacity). As a result, courts "merely examine whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213–14 (7th Cir. 2003)). "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong . . . and deserving of reversal." *Id.* at 413–14 (internal quotations and citations omitted).

In this case, as in most cases seeking review of a decision by the Commissioner of Social Security in this circuit, the plaintiff first criticizes the ALJ for including in his decision boilerplate language that the Seventh Circuit has repeatedly criticized. The language at issue reads:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

R. 29. Boeck first argues "this boilerplate credibility determination is 'meaningless' because the assessment of 'credibility' is not the correct standard used to weigh symptoms." Pl.'s Br. at 12. Instead, the standard is consistency. SSR 16-3p. *Id.*

She argues further that the language is meaningless because the phrase "'not entirely credible' yields no clue to what weight the trier of fact gave the testimony." *Id.* (citing *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012)). Boeck also argues that the language shows the ALJ committed the "fundamental error of fabricating the RFC first, and then using that as a scale to weigh Boeck's symptoms." Pl.'s Br. at 12. Citing *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012), Boeck argues that the ALJ stood the "adjudication process on its head, assessing listings, medical equivalence to listing, and giving the finding of residual functional capacity *without first* properly evaluating and weighing the claimant's statements about the severity of symptoms, and their limiting effects." Pl.'s Br. at 13.

Boeck's criticism of the ALJ for using the term credibility instead of the terminology of SSR 16-3p is hardly a reason for overturning his decision since he issued his decision two-and-a-half years before the new ruling went into effect. It is not error for an ALJ to fail to apply a ruling that did not yet exist at the time he issued his decision. Moreover, since the new ruling only clarified existing policy, the change does not require remand as long as the ALJ's analysis was in compliance with the ruling that was in effect.

Boeck's other criticisms of the ALJ's use of the "boilerplate" language used by the ALJ fare

no better. As I recently commented in another disability case, *Radosevich v. Berryhill*, No. 16-C-

1119, 2017 WL 4119626 (E.D. Wis. Sept. 18, 2017), these are common, one might even say

"boilerplate," criticisms that appear in many appeals from decisions denying Social Security disability

benefits. Absent more, however, they go merely to the writing style of, or the template used by, the

ALJ, as opposed to the soundness of the decision. The notion that the ALJ's credibility

determination should be overturned because the phrase "not entirely credible" fails to convey

precisely what weight the ALJ gave the claimant's statements treats a simple metaphor as a literal

requirement. Obviously, statements do not have weight. We speak of the weight given to a witness'

testimony as a way of describing how convincing or persuasive it is. The kind of precision that

measuring the weight of a material object allows is not possible when talking about the "weight"

given a witness' testimony. There is no standard measurement for assigning weight to witness

statements or other kinds of evidence. What is required in this context is an explanation of why and

in what respects the ALJ did or did not find the claimant's statements credible, not a specific

measurement of weight.

Similarly, the fact that the ALJ set forth the claimant's RFC in his decision before he

explained why he found the claimant's statements less than fully credible does not require remand.

The fact that he placed his RFC determination in his written decision before his detailed discussion

of the claimant's credibility does not mean he arrived at the RFC first and then constructed a

credibility determination to support it. This, too, is a matter of writing style. Many judges set out

their conclusion at the beginning of their opinions and then explain the reasoning process they used

to arrive at that result in the body. Others begin with their reasoning process and wait until the end

to reveal their conclusion. In either event, the writing is finalized only after the analysis is done and the decision made. As a result, just because the RFC is set out before the explanation is not a reason to conclude that it came first and the explanation was concocted to support it.

Courts should not reverse the Commissioner's decision because a judge does not like the ALJ's writing style. The question on judicial review is whether the ALJ followed the law and whether substantial evidence supports the Commissioner's decision. "[T]he simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." *Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir. 2013); *see also Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013) ("The use of boilerplate is innocuous when, as here, the language is followed by an explanation for rejecting the claimant's testimony.").

Boeck next suggests that the ALJ erred in considering the medical evidence to assess her credibility after finding at Step 1 of the two-step evaluation process that her medically determinable physical or mental impairments "could reasonably be expected to produce the claimant's pain or other symptoms." Pl.'s Br. at 13; R. 29. Once this Step 1 finding is made, Boeck seems to argue, the ALJ is required to move on to an evaluation of the non-medical evidence, including "daily activities; the location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and any other

factors concerning an individual's functional limitations due to pain or other symptoms." *Id.* at 13–14 (quoting SSR 16-3p).

Boeck is simply wrong to the extent she is arguing that it is improper to consider medical evidence in assessing a claimants symptoms at step 2 of the evaluation process. The regulation that governs the evaluation of symptoms explicitly lists "consideration of medical evidence" as the first category of evidence to consider in evaluating a claimant's alleged symptoms once it is determined that her impairments could be expected to reasonably produce such symptoms. 20 C.F.R. § 404.1529(c)(2). SSR 16-3p likewise lists "consideration of medical evidence" as the starting point in the evaluation of a claimant's symptoms. 2016 WL 1119029 *4. In the words of SSR 16-3p, "objective medical evidence is a useful indicator to help make a reasonable conclusion about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities." *Id.*; *see also* 20 C.F.R. § 404.1529(c)(2) ("Objective medical evidence of this type is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work."). The new ruling explains why:

> The intensity, persistence, and limiting effects of many symptoms can be clinically observed and recorded in the medical evidence. Examples such as reduced joint motion, muscle spasm, sensory deficit, and motor disruption illustrate findings that may result from, or be associated with, the symptom of pain. These findings may be consistent with an individual's statements about symptoms and their functional effects. However, when the results of tests are not consistent with other evidence in the record, they may be less supportive of an individual's statements about pain or other symptoms than test results and statements that are consistent with other evidence in the record.

SSR 16-3p, 2016 WL 1119029, at *5. By way of an example, the ruling describes an individual with reduced muscle strength testing who indicates that for the last year pain has limited her standing and

25

walking to no more than a few minutes a day. The ruling explains that such a person "would be expected to have some signs of muscle wasting as a result. If no muscle wasting were present, we might not, depending on the other evidence in the record, find the individual's reduced muscle strength on clinical testing to be consistent with the individual's alleged impairment-related symptoms." *Id.*

In this case, the ALJ's discussion of the medical evidence in relation to Boeck's alleged symptoms was entirely proper and complied with the Social Security Administration's (SSA's) regulations and rulings on assessing a claimant's statements concerning her symptoms. The ALJ first noted that only two days after ALJ Zellman issued his decision finding Boeck no longer disabled as of May 20, 2010, Dr. Horan removed the hardware that seemed to be causing her left knee pain. R. 30. According to Dr. Horan's report, two weeks after the surgery, Boeck told him that the pain was gone and she was walking "extremely well." *Id.* (citing 520). The ALJ also referenced Dr. Horan's October 2011 report in which he noted that his examination revealed that Boeck "was starting to regain her extension power, her knee is stable with no effusion or erythema." *Id.* (citing R. 521). By December of 2011, the ALJ noted, Boeck told Dr. Horan that "her left knee was fine but that she was having right ankle difficulty." *Id.* (citing R. 522). Dr. Horan "injected her peroneal tendon sheath with Kenalog and Marcaine, resulting in almost 100% relief of her symptoms" and told her to return as needed. *Id.*

While acknowledging that her primary physician, Dr. Michael Staudinger, nevertheless continued to prescribe oxycodone for Boeck, the ALJ noted that even his reports noted that she "retained normal bulk, tone and strength" and that she exhibited no neurological deficits over the following year, notwithstanding her claim that her constant pain and disability prevented her from

standing or walking more than fifteen minutes before she needed a twenty-minute break. *Id.* (citing R. 546–55).

The ALJ next discussed the findings of Dr. Sturm from his consultative examination of Boeck in July 2012. Despite her complaint of severe ankle pain, Dr. Sturm noted that she had a normal gait and performed normal heel-toe walking with little hesitancy. R. 31. She did not have limited range of motion or effusion in either knee, and she had full range of motion with no tenderness or swelling of her right ankle. *Id.* X-rays of Boeck's left knee at that time "showed <u>mild</u> medial compartment osteoarthritis and remote post-traumatic and postsurgical changes of the patella." *Id.* (underline original).

As for her right ankle, the ALJ noted that though she "experienced some increased symptoms around July of 2013, it appears that her symptoms subsequently improved with treatment." R. 31. The treatment consisted of the revision, right calcaneal osteotomy performed by Dr. Horan. *Id.* The record shows that although she later developed an infection requiring hospitalization, the infection cleared with treatment. The ALJ noted she was seen in March of 2014 by Dr. Hausserman at the Kennedy Center Clinic with a complaint of "long-standing right ankle pain." On examination, Dr. Hausserman noted Boeck had a "mildly antalgic gait." Based on this and other findings, Dr. Hausserman concluded that "her current symptoms are consistent with a mild plantar fascitis but the primary etiology appears to be subtalar arthritis with restricted motion." *Id.* (citing R. 573). He referred her to Dr. Todd Derksen for a podiatry consultation. *Id.*

The ALJ noted that Boeck saw Dr. Dirksen in May 2014 "for a second opinion regarding her right ankle pain." *Id.* (citing R. 567). On examination, Dr. Derksen noted "minimal edema about the ankle posteriorly with no erythema or ecchymosis." *Id.* She had decreased ankle joint range of

motion, especially with the knee extended. She had some tenderness and mildly restricted range of motion in other areas as well. X-rays of the right foot demonstrated soft tissue that was within fairly normal limits and degenerative changes in the joint spaces. Based on his examination, Dr. Derksen diagnosed Aquinas with insertional Achilles tendinitis and subtalar degenerative joint disease in the right foot. He recommended that Boeck pursue physical therapy. R. 31–32.

Whether one applies a standard of "consistent" or "credible," the ALJ's conclusion that the medical evidence does not support the degree of pain and disability alleged by Boeck is entirely reasonable. Boeck's statement that she experienced constant, aching pain in her left knee, right ankle, and right wrist are not consistent with the medical record. This is different than saying the medically determinable impairments she has could reasonably be expected to produce the symptoms she claimed, which was the Step 1 determination. At Step 2, the ALJ looks to the medical and other evidence to help decide whether the impairments did cause the degree of pain and disability alleged. Here, the ALJ reasonably concluded that they did not.

Though Dr. Staudinger continued to prescribe oxycodone, there is no record of treatment for left knee pain after the hardware removal by Dr. Horan in August 2011 and Boeck pronounced the pain gone two weeks later. R. 520. Similarly, following the ankle surgery Dr. Horan performed in July 2013, the only other doctor visits she had were for consultation. Dr. Hausserman saw her once and referred her for a podiatry consultation, and Dr. Derksen, the podiatrist, also saw her once and recommended she pursue physical therapy.

With respect to her right wrist pain, the ALJ noted that Boeck "required no significant treatment for her alleged symptoms during the period relevant to this decision." R. 24. Indeed, none of the medical treatment records address any complaint by Boeck of right wrist pain. Even Dr.

28

Staudinger, Boeck's family physician who saw her on twelve separate occasions for office visits between April 14, 2011, and January 16, 2013, never once recorded a complaint that she was experiencing right wrist pain or limitations. R. 546–57. And as the ALJ also noted, Dr. Sturm found during his examination in July 2012 she had 43 pounds of grip strength in the right hand compared to 62 pounds of strength in the left. She was easily able to bend a paperclip into three small shapes and had full range of motion. From this, the ALJ reasonably concluded that her right wrist impairment did not have more than a minimal effect on her ability to perform work-related activity and thus did not constitute a severe impairment. R. 25.

As to her alleged mental impairment, the ALJ similarly noted the absence of treatment during the relevant time period, other than a prescription for Paxil that Dr. Staudinger appears to have periodically renewed. R. 547, 553. While she was diagnosed with a moderate depressive disorder and dysthymia by Psychologist Kathleen Roblee in March 2011, for which she received outpatient mental health treatment, her last session was in August 2011. The ALJ noted that her treatment provider discharged her from treatment less than a month after her alleged onset date on September 2011, noting she had a Global Assessment of Functioning score of 65, indicating some mild symptoms. R. 26 (citing R. 452, 454–55). The ALJ also referenced a note in the discharge summary indicating "client is discharged as successfully completing her treatment goal." *Id.* (citing R. 457).

In assessing Boeck's mental health symptoms, the ALJ also relied upon the testimony of Dr. Hauer, the psychologist who served as a medical expert. Dr. Hauer reviewed the entire record and listened to Boeck's testimony. He testified that she had a dysthymic disorder which he described as a persistent low-grade depressive disorder. R.148–49. The ALJ gave "great weight" to Dr. Hauer's testimony that Boeck had no limitations from a mental health standpoint in her activities of daily

living, only mild limitations in social functioning and concentration, and no episodes of decomposition, leading him to conclude that Boeck did not have a severe mental impairment. R. 27–28. To the extent that the ALJ's assessment of the medical opinions bearing on this issue stand, an issue addressed below, it also supports the ALJ's assessment of Boeck's statements and testimony regarding her symptoms.

Of course, it is true that once it is determined at Step 1 that an impairment could cause the symptoms claimed, an ALJ cannot "disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." SSR 16–03p, 2016 WL 1119029, at *5. But that is not what the ALJ did. To a large extent, the ALJ's conclusion that the medical evidence was not consistent with Boeck's claimed symptoms was based not on the lack of objective medical evidence, but on her subjective reports, or the absence thereof, to the very doctors who were treating her.

Moreover, the ALJ also offered other reasons for finding Boeck's statements and testimony "not entirely credible." R. 29. He noted that despite her claims of continuous disability since April 2009, ALJ Zellman had found that her disability had ended in May 2010, and that from then until at least August 26, 2011, when he issued his decision, she was not disabled. R. 30. This finding, wholly inconsistent with much of her testimony, was final. The ALJ also commented on her statement to Dr. Sturm that she had decided to forgo health coverage under her husband's policy because "family coverage was too expensive," noting that the decision was "not consistent with her allegations of disabling impairments." R. 30. The ALJ explained that Boeck's "reports to Dr. Sturm regarding her physical abilities varied considerably from her other subjective reports regarding her

30

limitations." R. 30–31. He also thought her reported daily activities of preparing meals, assisting with light housework and shopping were consistent with the ability to perform light work. R. 32. "Overall," the ALJ concluded, "the objective medical evidence, the observations of examiners and the claimant's activities of daily living are not consistent with the claimant's allegations, made through her representative, that she is unable to sustain even sedentary exertional work." *Id.* Implicit in the ALJ's conclusion is the further finding that she did not need the amount of oxycodone Dr. Staudinger had been prescribing. In truth, there is no medical evidence that he was still prescribing oxycodone or any other medication for her after January 16, 2013. In the Musculoskeletal Impairment Residual Functional Capacity Questionnaire he completed on August 6, 2014, two weeks after the hearing, Dr. Staudinger wrote "none" in response to the question "Identify the side effects of any medication which may have implications for working, e.g., dizziness, drowsiness, stomach upset, etc." R. 647.

Other than criticizing the ALJ's writing style and use of the medical record to assess her alleged symptoms, Boeck's argument consists primarily of pointing to her own statements and testimony. "The finding of sedentary work with no nonexertional limitations," she contends, "is further contradicted by Boeck's reports." Pl.'s Br. at 14. She then proceeds over the next seven pages of her brief to point out how the ALJ's finding that she was capable of sedentary work is inconsistent with her own account of her functional limitations. R. 14–21. Her argument assumes that in assessing the truthfulness and accuracy of her statements concerning her symptoms, the ALJ is limited to considering those very statements concerning her symptoms. But apparently not all of her statements—she makes no mention of her statements to Dr. Horan two weeks after the surgery that the pain in her left knee was gone and three months later that "her left knee is doing just fine."

31

R. 520, 522.  Even aside from the inconsistency, however, to state the argument is to refute it.  If a claimant is not truthful in reporting her symptoms, citing her own statements as evidence of her symptoms makes no sense.  Rare is the disability claimant who admits to engaging in daily activities that belie his or her claim that he or she is unable to hold a job.

Boeck's argument also assumes that it is not enough for the ALJ to explain why he finds her statements concerning her symptoms "not entirely credible," but insists that each statement she made must be viewed in isolation and assessed separately.  For example, she cites to her statement in two self-reports that she was prescribed a cane and then argues that the ALJ erred in failing to mention her use of a cane in his decision.  Pl.'s Br. at 17 (citing R. 350, 367).  But Boeck did not testify at the hearing before ALJ Bartelt that she uses a cane.  In fact, at her hearing before ALJ Zellman three years earlier, she denied regularly using a cane when she walks.  R. 81.  Even now, she fails to cite any record indicating who prescribed a cane for her and when, instead merely noting that she later testified at the previous hearing that she used one when the weather was bad.  Pl.'s Reply Br. at 5–6 (citing R. 95–96).  Yet, Boeck faults the ALJ for not including a specific finding as to the credibility of her statement that she requires use of a cane in his decision and accuses the Commissioner of using a "post hoc rationalization" to support the ALJ's decision by pointing out her previous testimony.  *Id.*

It is not "post hoc" to respond to an argument made for first time in her brief challenging the ALJ's decision.  More generally, requiring a separate credibility assessment of each statement a claimant makes concerning her symptoms, a requirement not even imposed in criminal cases where individual liberty or in some cases, life itself, is at stake, is plainly unreasonable.  Such a requirement

would either result in the routine granting of a great number of questionable applications or bring to a standstill an already overburdened system.

There is no presumption that the statements of claimants seeking disability benefits are true absent conclusive evidence that they are exaggerating their symptoms. It would be a strange (and likely insolvent) system that required that applicants be awarded such valuable benefits whenever an ALJ in a non-adversary proceeding was unable to conclusively refute each subjective complaint of pain and disability a claimant makes. It is the province of the factfinder to weigh the evidence and draw reasonable inferences therefrom. "[S]ubstantial evidence is evidence which a reasonable mind would accept as adequate to support a conclusion, such that where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision rests with the Commissioner." *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). Because the ALJ followed the correct procedure and it is not patently wrong, his credibility assessment will not be disturbed.

## C. Assessment of Medical Opinions

Boeck next argues that the ALJ failed to accord sufficient weight to all of the opinions of Dr. Staudinger and Dr. Derksen contained in the "Musculoskeletal Impairment Residual Functional Capacity Questionnaire" forms her attorney sent to the ALJ on her behalf. Pl.'s Br. at 21–25. She also claims that the ALJ erred in his assessment of the medical consultants. *Id.* at 25–28.

Here, the ALJ gave "some weight" to the opinions of Dr. Staudinger expressed in the form he completed on August 6, 2014 and that was submitted after the hearing. R. 33. However, the ALJ specifically discounted Dr. Staudinger's opinion that Boeck's symptoms would cause her to miss work more than three times per month. *Id.* He also discounted Dr. Staudinger's opinions regarding

Boeck's wrist impairment based on her level of treatment and the observations of other examiners. *Id.*

The ALJ gave great weight to the opinions offered by Dr. Derksen in the form he completed in July 2014, particularly his opinion that, contrary to Boeck's statements, she could walk for four hours a day, sit for at least six hours a day, and stand for an hour at a time. R. 32–33. Here also, however, the ALJ did not credit all of Dr. Derksen's opinions. He did not credit Dr. Derksen's opinions that Boeck would miss work about once per month or that her pain would frequently interfere with her attention and concentration. *Id.* Boeck argues that the ALJ erred in failing to adequately explain why he did not give all of the opinions expressed by her two "treating physicians" in the forms they completed controlling weight. Pl.'s Br. at 21.

Under the "treating source rule," a treating physician's opinion is entitled to "controlling weight" if it is adequately supported by objective medical evidence and is not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). If the ALJ discounts a treating physician's opinion, the ALJ must offer "good reasons" for doing so. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). The ALJ must then determine the opinion's weight using the factors listed in 20 C.F.R. § 404.1527(c), including the "length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion." *Campbell*, 627 F.3d at 307 (quoting *Larson*, 615 F.3d at 751). The ALJ is not required to "explicitly weigh every factor." *Henke v. Astrue*, 498 F. App'x 636, 640 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d 408, 414–16 (7th Cir. 2008). Rather, the ALJ need only "sufficiently account for the factors." *Schreiber v. Colvin*, 519 F. App'x 951, 959 (7th Cir. 2013). An ALJ need only

"minimally articulate" his reasoning for the weight he assigns to a physician's opinion. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012). The ALJ's analysis is more than sufficient here.

Dr. Derksen was hardly a treating physician. Insofar as the record reveals, and as the ALJ recognized, Dr. Derksen saw Boeck one time for "a second opinion on right ankle" on May 21, 2014, only two months before her hearing, and he recommended she pursue physical therapy and follow-up with him after she completed it. R. 31, 567–68. Other than the "Musculoskeletal Impairment Residual Functional Capacity Questionnaire" he completed on July 16, 2014, less than a week before the hearing, the record contains no other reports from Dr. Derksen. R. 622–27. In explaining why he rejected Dr. Derksen's opinions that Boeck's pain would frequently interfere with her attention and concentration, and that her impairments would cause her to be absent from work one day per month, the ALJ observed that, unlike Dr. Derksen's other opinions, these opinions were not consistent with his own observations and findings and the level of ongoing treatment. R. 33. He also noted that these opinions seemed to be based on Boeck's subjective reports of pain, as opposed to medical findings.

These are proper reasons for discounting Dr. Derksen's opinions about Boeck's attention and concentration problems and her likely absenteeism. There was nothing in Dr. Derksen's one report, which the ALJ thoroughly summarized, that supported either opinion. R. 32–33. Indeed, these two opinions seem inconsistent with the other opinions reflected in the questionnaire he completed. Dr. Derksen noted, for example, that she could sit continuously for eight hours and stand continuously for one hour "in a competitive work situation on an ongoing basis." R. 625–26. He also noted she could stand/walk about 4 hours "total in an eight hour work day (with normal breaks)." R. 626. Contrary to Boeck's own statements about her functional capacity, Dr. Derksen

did not think she needed to lie down during an eight hour day, shift positions at will, or have her legs elevated, and he indicated she had no significant limitations in "the ability to use hands and fingers **for actions in a competitive job**." R. 626–27 (bold original). He also did not think she should use a cane or other assisted device. R. 626. These are hardly the kind of findings one would expect for a person so impaired that they could not pay attention for more than 45 minutes or regularly show up for work.

The ALJ also offered as a reason for partially discounting Dr. Derksen's opinions the fact that they were based in part on subjective complaints of pain: "Dr. Derksen described 'tenderness' and reduced range of motion as the objective findings supporting his conclusions; however, tenderness can be quite vague and not totally objective." R. 33. This, too, is not an improper reason for discounting a medical opinion. *See, e.g., Edwards v. Sullivan*, 985 F.2d 334, 337 (7th Cir. 1993) ("In fact, many of Dr. Hisgen's diagnoses appear to be conclusory statements documented in an attempt to explain Edwards' subjective complaints of pain and tenderness in her neck, chest, and right leg."). The ALJ's finding that Boeck's reports of symptoms were not entirely credible logically weakened the reliability of opinions that were based on such reports. Finally, Dr. Dirksen's expertise was in feet, and based on a single evaluation of Boeck's right ankle, the ALJ was not required to accept his opinions as to whether she could concentrate and pay attention, or how many times a month she might be absent.

Boeck also argues that "[t]he ALJ was not medically qualified to hold that the treatment provided by Dr. Derksen was insufficient." Pl.'s Br. at 23. But the ALJ never said Dr. Derksen's treatment was insufficient. Indeed, Dr. Derksen did not treat Boeck; he only saw her one time for a second opinion. R. 567, 624. What the ALJ actually said was "the claimant's level of ongoing

treatment is not consistent [with] Dr. Derksen's opinions regarding the claimant's ability to concentrate or the claimant's absenteeism." R. 33. That is true. If Boeck really was in so much pain that it frequently interfered with her attention and concentration and she was unable to go to work once a month, one would reasonably expect she would have sought treatment. Instead, there is no record of treatment for her ankle after her July 2013 surgery performed by Dr. Horan. The only medical records relating to her right ankle after her infection cleared in October 2013 are the March 5, 2014 "new patient" visit to The Kennedy Center for an evaluation by Dr. Hausserman that ended with a referral to Dr. Derksen, followed by the May 2014 visit with Dr. Derksen that resulted in a recommendation for physical therapy. R. 572–73, 567–68. The record is silent as to whether Boeck followed through on the physical therapy Dr. Derksen recommended or any other treatment thereafter.

Boeck suggests that the lack of treatment might be due to the lack of insurance and her financial circumstances. Pl.'s Br. at 26. She told Dr. Sturm that she and her husband opted out of family coverage available through her husband's employment due to the expense. R. 541. But that was in July of 2012. *Id.* Except for difficulties with insurance coverage for mental health treatment about seven months before the hearing, R. 139, Boeck never mentioned any problem obtaining treatment for her physical impairments due to financial reasons, and the record reflects regular medical treatment, including surgery and a hospitalization for her ankle infection, throughout the year after her statement to Dr. Sturm in 2012. Nor do the medical reports suggest such a problem. More importantly, there is no evidence that any treatment, other than the physical therapy recommended by Dr. Derksen two months before the hearing, was indicated. In other words, there was no evidence she needed additional treatment, whether she could pay for it or not. To recognize

this absence of treatment is not to "play doctor" which Boeck accuses the ALJ of doing. It is another valid reason for partially discounting Dr. Derksen's opinion.

The ALJ also provided sound reasons for not crediting Dr. Staudinger's opinion that Boeck had significant right wrist limitations and was likely to miss at least three days of work per month because of her impairments. As with Dr. Derksen, the ALJ found that the level of treatment did not support the opinion concerning the number of days she would be absent. R. 33. Again, this was true. Indeed, other than prescribing oxycodone and, on occasion, Paxil, Dr. Staudinger's reports indicate he provided no treatment at all and little by way of examination. R. 546–55. Moreover, the last time he saw her appears to have been January 13, 2013, six months before Dr. Horan performed the surgery on her ankle, and a year and a half before he completed the questionnaire Boeck claims the ALJ was required to credit. R. 546. The ALJ also noted that Dr. Staudinger's opinion concerning the number of absences she would have, like Dr. Derksen's opinion in this regard, appeared to be based on her subjective reports of pain, a fact that is borne out by his treatment records. R. 33. The ALJ noted that Dr. Staudinger's opinion concerning Boeck's right wrist impairment, as explained above, found no support in Dr. Staudinger's own records, and was inconsistent with the other examinations and treatment records. Finally, the ALJ noted that Dr. Staudinger indicated on the questionnaire he completed that "to accurately answer questions H & I above, a formal functional capacity exam would be indicated." R. 649. Although H and I concerned the amount of weight she could lift and carry, and the use of her hands and fingers, the ALJ thought it indicated that Dr. Staudinger lacked full confidence in his answers in general. R. 33 (citing R. 649).

Boeck argues that the ALJ failed to specifically address Dr. Staudinger's opinion that she was limited to standing or walking for no more than 20 minutes at a time, and she would need to frequently walk around to relieve pain, limitations that could preclude some sedentary work. Pl.'s Br. at 25. But while the ALJ did not provide specific reasons for rejecting these limitations, the general reasons he provided for giving Dr. Staudinger's opinions only "some weight" were sufficient. Unlike *Peterson v. Chater*, 96 F.3d 1015, 1016 (7th Cir. 1996), this is not a case where the ALJ expressly adopted limitations that were inconsistent with the RFC he assessed. The ALJ did not say he was adopting Dr. Staudinger's opinion as to this limitation. To the contrary, it is clear from the RFC he adopted, well supported by the evidence, that the ALJ did not accept this part of Dr. Staudinger's opinion either. I therefore find no error and substantial evidence to support the ALJ's assessment of Dr. Staudinger's opinions.

As to the consulting physicians, Dr. Trippe and the State agency non-examining physicians, Drs. Jennings and Musholt, Boeck complains that the ALJ failed to adopt the degree of limitations they thought she had due to her mental impairment. Dr. Trippe, who examined Boeck in June 2012, diagnosed Boeck with major depressive disorder based on her history and presentation of symptoms such as "a depressed mood, markedly diminished interest or pleasure in activities, decreased appetite, insomnia, and feelings of worthlessness." R. 537. He thought she had moderate limitations in several areas, including ability to adapt to change, concentration and focus, ability to maintain a regular schedule of activities, and ability to tolerate work stress. *Id.* State agency consultants Beth Jennings, Ph.D., and Edmund Musholt, Ph.D., reviewed the record, including Dr. Trippe's report in July 2012 and March 2013, respectively. Dr. Jennings agreed with Dr. Trippe that Boeck had a major depressive disorder and moderate difficulties in maintaining concentration, persistence, or

pace, no episodes of decomposition and only mild limitations in the other broad areas of mental functioning. R. 165. Dr. Jennings also noted several moderate limitations in the Mental RFC evaluation she completed. R. 167–68. And though Dr. Musholt also agreed with Dr. Trippe that Boeck had a major depressive disorder and had moderate limitations in maintaining concentration, persistence or pace, he concluded that her mental impairment was not severe. R. 196–97.

The ALJ did not disregard these opinions. Indeed, he discussed each of them in the course of his decision and gave each some weight. R. 27. However, the ALJ gave great weight to Dr. Hauer, the medical expert who reviewed the entire record as it existed on the date of the hearing and observed Boeck's testimony. *Id.* Dr. Hauer found only mild limitations in the broad areas of mental functioning and no periods of decomposition, indicating that her mental impairment was not severe.

Dr. Hauer gave several cogent reasons for his opinion that Boeck had at most only mild limitations in her mental functioning based on his review of the entire file, including Dr. Trippe's report, and Boeck's testimony at the hearing. R. 148–50. As to social functioning, Dr. Hauer noted Boeck had a history of being able to sustain relationships and was able to leave the home, but had a mild deficiency in the area of social interest. Regarding her concentration abilities, Dr. Hauer indicated that her mental status examinations did not confirm her subjective complaints regarding attention, concentration and memory deficits. Instead, Dr. Hauer noted she appeared logical, well-organized and focused during examinations and testing that demanded focus and attention. It was also undisputed that she had no episodes of decomposition. The ALJ concluded that Dr. Hauer's opinions were consistent with her performance during the consultative examination, with her reports on the Function reports and with the need for only conservative treatment. R. 28.

Boeck's attack on the ALJ's decision to accord Dr. Hauer's opinion great weight in effect consists of repeating the statements she made to Dr. Trippe during his evaluation and upon which he based his conclusions, and criticizing the reasons the ALJ offered for according it only some weight. Pl.'s Br. at 25–26. The ALJ noted that Dr. Trippe had examined Boeck in July of 2012, and his opinions were "consistent with her subjective reports at the time of the consultative examination and with her performance during the consultative examination." R. 27. The ALJ concluded, however, based on the entire record, including Dr. Hauer's assessment, that Boeck's mental impairment was "slightly less limiting than Dr. Trippe thought, after considering the other evidence of claimant's activities of daily living and the claimant's need for only conservative treatment during the period relevant to this decision." R. 27. He obviously found the reasons Dr. Hauer gave for his opinion more persuasive. He also thought Boeck's "ability to manage money and engage in hobbies requiring considerable concentration suggests that she has only mild limitations in concentration, persistence or pace, contrary to the decisions of Drs. Jennings and Musholt." *Id.*

Boeck calls the last reason "speculation," Pl.'s Br. at 27, but this is similar to the opinion offered by Dr. Hauer. R. 150. Nor is it unreasonable to infer that one who reads, does crossword puzzles, and watches television as hobbies does not have major limitations in at least persistence and concentration. Boeck also accuses the ALJ of adopting Dr. Hauer's opinion simply because it supported his predetermined RFC. Pl.'s Br. at 28. In effect, he claims that the ALJ was biased and prejudged her case. Boeck offers no evidence that the ALJ predetermined her RFC and accorded great weight to Dr. Hauer's opinion because it fit. Indeed, even his argument about the structure of the ALJ's decision does not support his argument since the discussion of the weight given to the medical experts who opined on Boeck's mental impairment preceded his statement of Boeck's RFC.

I find no error in the ALJ's weighing of this evidence. The ALJ was presented "with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict." *Richardson v. Perales*, 402 U.S. 389, 399 (1971). That is precisely what the ALJ did here, and this court has no power to overturn it. I likewise find no reason to disturb the ALJ's weighing of the opinions of the State agency consultants as to Boeck's physical impairments. In fact, Boeck's argument with respect to their opinions is so undeveloped as to be waived. *See Crespo v. Colvin*, 824 F.3d 667, 673 (7th Cir. 2016) ("perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived").

For all of these reasons, I conclude that the ALJ did not err in his assessment of the medical opinion evidence offered in the case.

## D. Dictionary of Occupational Titles

Lastly, Boeck argues that the ALJ erred in relying on the *Dictionary of Occupational Titles* (DOT) at Step 5 of the sequential evaluation process. Based on his finding that Boeck had the RFC to perform the full range of sedentary work, and given her age, education and work experience, the ALJ noted that a finding of "not disabled" is directed by the Medical-Vocational Rule 201.27 and Rule 201.21. R. 34. The ALJ also noted, however, that the VE testified at the hearing that an individual with physical limitations described by Boeck in her testimony could still perform some unskilled sedentary jobs identified in the DOT. Boeck claims that the Seventh Circuit has determined the DOT to be obsolete in *Alaura v. Colvin*, 797 F.3d 503, 507 (7th Cir. 2015); *Herrman v. Colvin*, 772 F.3d 1110, 1113 (7th Cir. 2014); and *Dimmett v. Colvin*, 816 F.3d 486, 489–90 (7th Cir. 2016). Based on the holdings in this circuit that the DOT is obsolete, Boeck argues it was error for the ALJ

to conclude she was not disabled based on the number of sedentary jobs listed therein. Pl.'s Br. at 28–29.

Of course, Boeck's argument concerning the DOT has no impact on the primary reason for the ALJ's ultimate determination that Boeck was not disabled, given the ALJ's finding that she was capable of performing the full range of sedentary work. The conclusion that, as a younger individual with at least a high school education able to communicate in English, she was "not disabled" was directed by the Medical-Vocational Guidelines, which Boeck has not challenged. It is only the ALJ's alternative ruling that relied on the DOT. Even as to the alternative reason the ALJ offered for his finding, however, Boeck's challenge fails.

It is true that the Seventh Circuit has described the DOT as obsolete and sharply criticized the SSA for failing to endorse O*NET, which it described as "the most current manual of job descriptions," despite its awareness of "the obsolescence of the Dictionary of Occupational Titles." *Dimmett*, 816 F.3d at 489. But the Court has not held that it was *per se* error to rely on the DOT. Given the fact that the DOT remains first in the list of publications of job data of which the SSA has taken administrative notice, 20 C.F.R. § 404.1566(d)(1), this is not surprising. Holding that use of the DOT constitutes *per se* error would call into question all of the SSA adjudications in which the DOT plays a role. It would also run afoul of the rule requiring judicial deference "to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations." *Chevron v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 844 (1984); *Astrue v. Capato*, 566 U.S. 541, 558 (2012) ("*Chevron* deference is appropriate when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in

43

the exercise of that authority.") (internal quotation omitted). While O*NET may be a better source of job data than the DOT, it is hard to see why reliance on the DOT could be considered error in light of the SSA regulations. The number of jobs identified in the DOT within categories identified by the VE, even if not all fall within Boeck's RFC, are more than sufficient to constitute substantial evidence of jobs Boeck is capable of performing, given her RFC. I therefore find no error in the ALJ's reliance on the DOT.

## CONCLUSION

The ALJ followed the rules and regulations governing the adjudication of disability claims and provided a logical bridge from the evidence to his conclusion. His decision is supported by substantial evidence, defined as "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf*, 602 F.3d at 874. Accordingly, the decision of the Commissioner is affirmed. The Clerk is directed to enter judgment accordingly.

Dated this __30th__ day of September, 2017.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court